CENTRAL TRUCK LINES, INC., v. RAILROAD COMMISSION AND RECEIVERS OF AND FOR SEABOARD AIR LINE RAILWAY COMPANY.

160 So. 22.

Opinion Filed February 28, 1935.

*Milam, McIlvaine & Milam,* for Relator;
*W. J. Oven* and *T. T. Turnbull,* for Respondents.

Davis, J.—Central Truck Lines, Inc., a corporation, has filed this petition for certiorari attacking as contrary to law an order entered by the Railroad Commission granting its approval to an application for a certificate of public convenience and necessity sought by the Seaboard Air Line Railway, a rail carrier, for the purpose of enabling it to operate a daily motor vehicle common carrier service between Tampa and Brooksville and between Waldo and Morriston, conditioned that when the business to be done by motor carrier so increases as to be profitable to transport by rail, the transportation in motor vehicles over the highways shall be abandoned and the rail service for which the highway transportation is thus substituted, shall be resumed.

No writ of certiorari has been issued, but by special order of this Court, the merits of the case have been orally argued, and all contentions of the respective parties fully presented in briefs filed in support of the pending application for such writ. So the proposition before us is whether or not the writ of certiorari shall issue and the order complained of be quashed thereon, or the proceeding dismissed for want

of a substantial ground of invalidity appearing in the Commission's order to which the pending application for certiorari relates.

The facts of this case as found by the Railroad Commission and set forth in its order, are as follows:

"(a) That the Receivers of the Seaboard Air Line Railway operate a daily train from Baldwin to Tampa. That they consider it one of the most important freight trains they operate in that it transports through freight from the west into Florida. That they also operate another daily through freight from Tampa to Baldwin. That both of these trains run through the territory involved in this application, but on account of the speed of the trains they are unable to stop at all stations and give service. That on this account this carrier also operates what is known as a turn-around service leaving Waldo in the morning and going to Morriston and occasionally as far as Dunnellon returning to Waldo in the afternoon. That in addition it has a tri-weekly local freight between Tampa and Dunnellon and also a turn-around train operating from Tampa to Brooksville and back to Tampa. That by means of these trains it handles all kinds of freight including a large tonnage of perishables such as cucumbers, eggplant, okra, corn, peppers and watermelons. That a great percentage of these perishables go to the eastern markets or the western markets and is a through movement. That many of these products are shipped by express. That these products must be at Waldo or at Tampa at a certain time in order to make the through train connection. That, if it does not make this through express connection for the eastern markets it means twenty-four hours delay to the express. That these local and turn-around trains gather up these shipments, but are not able to handle all of the L.

C. L. freight shipments as between these points because of the fact that it is necessary to have these products arrive at Waldo at a certain closing hour in order to make the through train connections. That in many instances L. C. L. freight is left at these stations because these turn-around trains or local freights are not able to handle it. That it is the purpose of the Receivers of the Seaboard Air Line Railway to substitute in part truck service for these turn-around trains and the greater part of the tonnage that would be transported on the trucks would be the express tonnage which must make through train connection. That the substitution of this truck service would enable the local freights to serve all of these stations and pick up and deliver freight because they would not be required to be on any particular schedule as it would not be necessary for them to make these through train connections. That the shipment of vegetables is a seasonal operation and that for a good part of the year these special turn-around trains that are operated between these points could be abandoned and only the local freights operated and through this means a saving would be realized to the rail carrier of between $8,000.00 and $10,000.00 per year.

"(b) That it is not the purpose of the applicants to make pick up and store door delivery at Tampa, Brooksville, Waldo or Morriston or any intermediate points with these motor vehicles. That it only proposes to transport express or through freight which is delivered to them at their railway stations. That the applicants are agents of the Railway Express Agency and transport such express as is delivered to them at their freight stations. That the Express Company picks up and delivers its own express and delivers to the rail carrier at its depot and the applicant proposes to pick up this express from its own stations and

transport it on its tracks along the highway to its stations and in no event to attempt to transport for the public generally or to pick up and deliver freight for the public.

"That in its opinion it will not impair the operations of any motor carrier along said route as it only proposes to transport express and freight that it now transports over its rail line, and that this service is in fact a mere substitution of truck service for rail service."

A majority of the Commission were of the opinion that the granting of the application would effect a considerable saving to the rail carrier in its operation of train service, that the railroad was badly in need of revenue, and that the authorization sought would, if approved by the Commission, result in an expedited service of express and through freight that would be of benefit to the public. They were likewise of the opinion that the proposal to substitute truck service for rail service should only be permitted until business on the railroad so increased as to warrant a resumption of train service, in which event the truck service should be required to be abandoned. The Commission's order was so framed as to thus express and condition the Commission's approval of the application.

The Railroad Commission has been made the repository of a general grant of regulatory powers as to both rail and motor carrier services performed in the State of Florida. It supervises and regulates railroads (and to some extent water carrier service) by virtue of the long standing statutes of this State on that subject. See Sections 6692-6751 C. G. L., 4607-4665 R. G. S. It supervises and regulates auto transportation companies and their peculiar services by virtue of Chapter 13700, Acts 1929, and Chapter 14764, Acts 1931, which re-enacted and superseded the 1929 Act on the same subject. All of these statutes are in contem-

plation of law statutes in *pari materia* and have for their object the appropriate regulation of both rail and motor transportation services in their relation to each other and in relation to the carrying on of commerce in the State insofar as the subject of transportation is concerned.

As evidence of the legislative purpose to be served by Chapter 14764, *supra,* that Act contains an express requirement to the effect that in exercising its functions under the auto transportation law the Railroad Commission shall (not may) take into consideration the effect that the exercise of its powers of regulation and supervision of motor carriers may have upon transportation as a whole within any particular territory as to which the licensing of motor vehicle facilities may be sought. Another object to be achieved by that Act (perhaps its most important one) is to foreclose the' inordinate use of the public highways as a means of conducting carrier service for profit in cases where there is no showing of public convenience or necessity therefor under the facts of a particular case wherein permission is sought for a certificate approving such use by a particular applicant.

Our system of laws providing for the supervision and regulation of transportation over the public highways is therefore simply a means for ascertaining and declaring the proper adjustment of proposed or established relationships between competing services *qua* modes of highway transportations and the paramount right of the State, in the interest of its citizens, to have the use of publicly constructed highways conserved for a general public use and protected against unnecessary traffic hazards as well as inordinate wear and tear occasioned by unnecessary carrier transportation being conducted for private profit thereon.

Chapter 14764, *supra,* employs the phrase "public con-

venience and necessity" as the legislative standard by which the exercise of the powers of the Railroad Commission vested under that Act is to be measured. The phrase "public convenience and necessity" has not been defined by the lawmakers in the Act, nor indeed has it ever been defined in any precise way by the courts. Each case has therefore been largely left to be decided on its own peculiar facts when weighed in the light of the declared legislative purpose of the statute. That purpose, as clearly evidenced by its language and implication, was to so supervise, adjust, regulate and control the co-ordination of public carrier services, both rail and motor, *inter sese* as well as toward the State and the general public, as to attain therefrom the fullest measure of protection for the highways and at the same time insure the maintenance of an adequate transportation system to serve the essential needs of the people.

Thus the Legislature by a discreet generality in its use of language to describe the object intended to be achieved by its enactment of Chapter 14764, *supra,* has imposed the burden on the Railroad Commission (subject to a limited review in the courts) to discern and decide from the skein of apparently conflicting proposals and objections interposed by parties contesting before it, what particular requirements must be enacted or permits granted, in order to foster or protect the "public convenience and necessity" in its relationship to the rights asserted in a controversy between opposing carrier interests. In administering the Act in this particular the Railroad Commission is therefore simply a legislative agency set up by law for the purpose of particularizing through its administrative processes and decisions, the execution of a general public purpose that has been necessarily defined in the most flexible language. So the Commission's conclusions when pronounced are ac-

cordingly to be construed as legislative in character. This
is so although they are arrived at in a quasi-legislative form
of procedure. And being so construed the Commission's
quasi-legislative orders must be upheld as valid unless it be
clearly and affirmatively shown that, through a misappre-
hension of the law or the facts on the Commission's part
in arriving at a particular order challenged in the courts as
invalid or beyond its powers, the Commission has produced
a result which in its practical operation and effect, is vio-
lative of the complaining party's legal rights in the premises
and contrary to some essential requirement of the law.

Section 27 of Chapter 14764, Acts 1931, construed in
connection with paragraph 12 of Section 6703, C. G. L.,
4618 R. G. S., constitutes ample statutory authority for the
Railroad Commission, in its co-ordinated supervision and
regulation of both classes of transportation service (rail and
motor carrier) to grant a limited certificate of public con-
venience and necessity confined in its effect to a mere com-
mutation of rail service, into a motor carrier service, where
there is no grant of a general or permanent privilege to the
railroad carrier to perform an additional motor vehicle serv-
ice on the highway beyond its own stations.

Where, as in a case like that now before this Court, per-
missive use of the public highways for common carrier
service is sought under a certificate of public convenience
and necessity of *special, restricted* and *temporary* character,
involving a use that is merely a substituted incidental motor
service covering a part only of a transportation movement
that would otherwise be required to be performed entirely
by carriage on railroad trains at a distinct disadvantage to
other rail service and attended by no particular prejudice
to the public interest, or detriment to the rights of com-
peting motor carriers, so long as carried out and performed

solely as a temporary and limited service, a railroad company may be granted a certificate of public convenience and necessity for a temporary restricted use of the highways as a substitute for rail carriage, without making the showing otherwise required for an additional and new service under an application for public convenience and necessity of the ordinary kind.

In the present case the record shows that no competing motor carrier operating in the affected territory is performing the identical service which the Commission in this case has approved for performance by the Seaboard Air Line Railway Company. The service authorized is limited to the movement of freight, the charges for transportation of which are to be paid to the rail carrier. The freight charges are to be assessed and collected as for an all rail movement. No local pick-up or delivery service is authorized. Nor does it appear that the addition of this special service to the traffic already on the highways will cause undue traffic congestion or otherwise operate to the public detriment by unnecessarily burdening the highways through an unwarranted increased wear and tear.

In addition, the showing is clear that the traffic involved is such as must be performed by the rail carrier in any event. This is so because the freight in controversy is confined to that which is delivered to the railroad's rail stations for carriage. The principal object to be achieved in its partial movement by highway is to expedite the handling of same as well as reduce the financial burden to the rail carrier if required to move it solely by rail. Should the requested permit be denied to the rail carrier, it would likely be reflected in an application for increased freight rates on rail traffic that actually is moved by rail, thereby directly prejudicing the public interest while accomplishing

nothing of advantage to transportation in the affected territory, or for the benefit of transportation as a whole.

We think that the statute and the showing before the Railroad Commission are sufficient to sustain the Commission's order granting to the Seaboard Air Line Railway Company a conditional and temporary permit to inaugurate a commuted rail freight transportation by motor under the circumstances · recited in the Commission's findings appended to its order, therefore the order is not invalid and the application for a writ of certiorari to quash it should be denied.

Certiorari denied.

WHITFIELD, C. J., and ELLIS, TERRELL and BROWN, J. J., concur.

BUFORD, J., dissents.

BUFORD, J. (dissenting).—I am unable to agree to the conclusions reached by a majority of the Court as expressed in the opinion prepared by Mr. Justice DAVIS.

I apprehend that the service authorized by the order of the Railroad Commission now under consideration is a new and independent motor truck service which will place an additional traffic burden on the highway. That it contemplates an independent and additional use of the highway by a rail carrier to perform a service which could as well and economically be performed by the railroad company on its own tracks without the incidental additional burden on the public road traffic. That the service will entail an expense to the carrier greatly in excess of the revenue to be earned if the conditions of the order are complied with.

I find in the record no proof of *public* convenience and necessity supporting the inauguration of the service contemplated.

I think the Railroad Commission was and is without authority to promulgate an order of this character except upon affirmative proof of the existence of *public* convenience and necessity and inadequacy of existing facilities to supply the needs of *public* convenience and necessity.

If the railroad company is not moving freight entrusted to it for transportation with that degree of promptness and dispatch with which the public is entitled to be served provision should be made to meet the demands by modern equipment operated on its own tracks.

If the railroad company may substitute the service here contemplated by the use of the public roads with the incidental increases in motor vehicle traffic, just what rail service may it not substitute with motor vehicle public road service without proof of the demand of public convenience and necessity and although existing motor vehicle service is entirely adequate to meet the demands in the affected territory?

For the reasons stated, I think the Railroad Commission in making the order under review departed from the essential requirements of the law, and the order should be quashed.